May it please the court, Terry Budd with my colleague, Anna Shoboloff, counsel for Enigma. I would like to reserve four minutes for rebuttal. All right, counsel, please be aware that the time shown on the clock is your total time remaining. Thank you. All right. May it please the court. In this case, Malwarebytes is asking this court to grant it a complete immunity for engaging in anti-competitive acts by blocking consumers from using software that they've used for years to protect their computers. Malwarebytes is asking for this immunity under a Good Samaritan statute, section 230. And they're asking for it even though they know that the software programs from Enigma, a direct competitor of Malwarebytes, are not threats to users' computers and are not unwanted programs. The programs from Enigma are programs that users have downloaded, purchased, renewed, and enjoyed protection for their PCs for almost 20 years running from viruses, malware, and other potential problems. The section 230 test that Malwarebytes is proposing is well beyond the boundaries and the reasonable parameters of section 230. Counsel, may I ask you, is it your position that the users have actually purchased the Enigma software? Yes, many of them have purchased the Enigma software and went out of the blue after not blocking us for eight years of both competing in business. Those users woke up one morning in October of 2016 and found their software being blocked. Software they had already paid for, software they had subscriptions for, and software that many of them had renewed before and were going to renew again. Counsel, you said many of them have purchased Enigma software. What percentage of the users had actually purchased Enigma software? Well, Your Honor, as of the time of the filing of the first amended complaint, we already had over 300 complaints of people who were having trouble using their Enigma software. That number against the total sales is not something I have and is not something that we had looked at for purposes of today. We obviously expect and could do that and would readily do that. And I was just curious about the numbers when you said many. I can tell you, Your Honor, that we have had millions of customers over the almost 20 years using the Enigma software, Spy Hunter and Wrench Hunter. The test being proposed by Malwarebytes is a test that violates the express words, purpose, policy, and title of the statute. But let me ask you this. The key phrase when I was reading the statute in the briefs seemed to me to be the phrase offensive material. I'm sorry, to be? The key phrase, excuse me, I should, we tell the lawyers to talk into the microphone and I wasn't doing it. The key phrase in the statute to me appeared to be the phrase offensive material. And do you agree with that, that that is important? I believe the statute, indeed the statute title, Good Samaritan, gives protection from liability for blocking obscene and offensive material. Obscene and offensive material are actually laid out in six categories in the statute, lewd, lascivious, excessively violent. And none of those fit our program. Our programming is not the program that was involved in Zango whatsoever. What about otherwise objectionable? An otherwise objectionable under the canon of ejusdem generis. That is a residual clause in the sentence that is limited and defined by the preceding seven words. Those preceding seven words give meaning to what otherwise objectionable means. The cases of Song Fai and Goddard out of the Northern District of California, both have held exactly that point. Which I understand they're not binding on this court, but they're certainly excellent guidance. Offensive or objectionable in whose eyes? Offensive or objectionable in this statute, which was written in 1996, when the focus was trying to empower parents and their children to use their children's homes, sexually obscene pornographic material. So the whole purpose of the statute originally derived from a concern over making sure that there was maximizing user control over what was going to be received. Otherwise objectionable is a phrase that has to be defined by the parameters of the category. It does it because it doesn't say or similarly object, it says otherwise objectionable, which kind of indicates that it doesn't have to be of the same character as the ones listed previously. Well, if Your Honor considers the Goddard case or the Song Fai case, and Your Honor considers the canons of construction, including ejusdem generis, where you have a phrase like that, that is a phrase at the end of a listing of categories by Congress, then that phrase doesn't have an open-ended meaning. If the statute were to be read for the phrase otherwise objectionable to mean anything that Malrobites wanted, Congress would not have needed to add the preceding seven  Congress would not have added obscene, lewd, lascivious, and the other words. It would have just said any material that's found to be objectionable. Yeah, but that was a long time ago. It was really a long time ago. And the statute has been used to go way beyond maybe even what Congress thought they were dealing with, but we made a policy decision, and it's been the Ninth Circuit case at issue here did it too, to say we don't want invasions of privacy and tracking and other things, those are objectionable too, as long as they're a way to highlight it and say, you may not want to use this, and then it's considered in this safe harbor. And, Your Honor, the Enigma programming that has been blocked here does not have any of those features. To begin with, the Zango case did not decide the question of what otherwise objectionable means. That issue was waived and was not before the court, and the court made that clear in the opinion. And the question of whether certain content could fall within the phrase of otherwise objectionable, I recognize that the courts have applied Section 230 in a way to allow for something more than the six categories. But the six categories and the application of otherwise objectionable is still something that goes to the nature of that type of content or creating the risk, a risk of damaging the files or putting the user at risk of being introduced to pornographic material or the risk of some sort of a security breach of the user's computers. Nothing about the material blocked unlawfully by malware bytes of Enigma does that. It does the opposite. It protects people from those types of risks. Counsel, would you agree that malware bytes characterized your client's software as harassing and potentially unwanted? I would agree that malware bytes, after never blocking our software as harassing and potentially unwanted, one day did that for anti-competitive targeting reasons, as we've explained in our papers. And that is an after-the-fact, self-serving characterization that they have thrown out there trying to defend what is really a pretext. And here, particularly in a motion-to-dismiss setting, this wasn't even a Rule 56 setting like XANGO. In a motion-to-dismiss setting, there should have been an opportunity for us to have an immunity. It's a defense they can assert, but they still have to establish certain factors. The reason I ask you that question is, if the basis for the blocking was the characterization as harassing and potentially unwanted, does that take away your argument regarding the otherwise objectionable language? No, Your Honor, it doesn't. Because harassing cannot be that broad and that wide open. In fact, it is exactly the issues that Judge Fischer spotted in his concurrence in his XANGO opinion, where he pointed out that if somebody were to read Section 230 in the manner Malwarebytes is proposing to this Court and make it a boundless, purely subjective test, then anyone could engage in anti-competitive conduct anytime they wanted and simply then say, oh, I'm going to hide behind Section 230. And Section 230 protects me, because I can't. Let me ask you this. Your concern is that this is being used for anti-competitive purposes, I take it. Yes. The statute seems to say, doesn't it say that the otherwise objectionable lewd, lascivious, filthy, violent, harassing, otherwise objectionable can be determined by the provider or user? The statute does say provider or user. But the statute cannot be read to mean the provider can subjectively, unilaterally decide all by itself, without any regard to the other categories in the statute, what it can block. Because if that were to happen, Your Honor, then everyone could decide to block everyone else. And the very purposes of the statute, as articulated in the language by Congress, to encourage and preserve free markets, to encourage the development of blocking filtering technologies, to maximize user control, all of those matters, all of those policies would be completely blown apart, would be violated by that type of totally subjective approach by any company. Let me ask you this, because as Judge Lasnik noted, this statute was passed a long time ago, and I believe its purpose was to support expansion of the Internet. This was when the Internet was kind of in its infancy. Have there been any bills introduced, legislation or talk of amending this to avoid the problem of anti-competitive conduct? No, on this, the amendments to the Communications Decency Act have actually been directed at what would be the child or sexual trafficking area, not to this type of civil dispute. But isn't that a recognition that the expectation is the market's going to take care of this problem? If somebody is blocking people for no reason, they'll become a pariah, and the word will get out, this is a bad deal, don't do this. I mean, look at Kaspersky. I mean, they were the defendants in Zango. Now they're, that's the Moscow people who infiltrated the last campaign. I mean, these things have a way of coming around on people, don't they? They also have a way of being abused, and they're not supposed to be a get-out-of-jail card, as the court referred to in the Internet Brands case or in Roommates, to allow people to engage in business torts. Just like Judge Fischer spotted, I noticed that on past the time, I want to say for my rebuttal, there are two things that I would like to get to in rebuttal if the court would so permit. Thank you very much for your time. Good morning, Your Honors. Good morning. Malwarebytes makes filtering software that protects individuals and businesses from the Internet's numerous and evolving threats. I think one thing that's very important that didn't quite come out in Mr. Budd's argument is that this is filtering software that consumers choose to download and use. They have the choice. They have the choice to search it out, download it, install it, and if they don't like the way it works, they can choose to use one of the many other filtering software options that are available, in effect. But a polling council says that the users have also elected to purchase Enigma. So how do we balance that if both products are products that have been affirmatively sought out? Your Honor, Malwarebytes identifies Enigma as a type of threat on the Internet that's evolved, really, since well after the communications decency was enacted, called a potentially unwanted program, a PUP. And PUPs exhibit numerous types of behaviors that Malwarebytes and other security professionals consider to be problematic, harassing, damaging to individual computer users. We consider them, Malwarebytes considers Enigma to be that type of product. And it tells consumers that. If consumers want to, if they don't agree with Malwarebytes' characterization and decision to block Enigma software, then the users have two options. One is, and this is in the complaint and it's somewhat disputed, one option is they can restore the program. They can continue to use it. Now, Enigma contends that this is not an easy function for consumers to use. That's, frankly, that's likely to be an argument that any company whose software is blocked is going to make about a filtering software. But on a motion to dismiss, we have to take the allegations in the complaint. That's true, right? That's absolutely true, Your Honor. And as I think a fair reading of the complaint is, and this is in excerpts of the record 40 through 45, is not that there is no ability for the user to continue to use both products simultaneously. But that they contend that it's difficult and confusing for the user. The other option, and this is record- But that's true, then. Is there really a realistic way for the user to opt out if it's made so difficult that the user will be discouraged? Is it really a method to use? We would contend that it is. And there- Could it be made easier? Is it intentionally made difficult? No, it's not. That's not the case. And in any event, this is not a requirement of Section 230C2B. This was the exact argument that was made before the Ninth Circuit in the Zango case. Zango made the exact same argument that it was difficult for users to whitelist or continue to use the Zango software, including Zango users who had affirmatively consented to use the Zango software. And the court, nonetheless, held that that was not a requirement of the immunity in C2B. But you were the one who made the argument that the user had the option. That is one option. And I want to get to the second option. The second option is that users don't have to use Malwarebytes. They don't have to use it at all. If they decide that they don't like the filtering that Malwarebytes does, they can choose to use a completely different software. They have no obligation to use our software. And this, again, goes to the free market dynamics that are at the heart of the statute. The Congress, and this is in 230B3, wanted to encourage the development of technologies that maximize user choice. And there is a choice here. And this is also reflected in the concurrence of Judge Fisher, which Enigma relies on so heavily. His concern was that there might be programs, and he focused on web browsers, which is not what we are, but there might be programs that surreptitiously block without any transparency to the user, where the user has no idea what blocking is going on. And that concerned Judge Fisher and his concurrence. Well, he was also concerned about anti-competitive motivations. And I think he want he want he was talking about, as I read it, he thought there ought to be some kind of good faith limitation, which your position is there's not, and you can do it in bad faith? Our position is not that you can do it in bad faith. Our position is that that is not an element that we are required to show to invoke the immunity, or that nor is it an element that they are required to prove that we acted, or that they can get around the immunity by alleging we acted in bad faith. What if Discovery showed internal memos in your company where Enigma is identified as a potential competitor who's cutting into our market share, and how can we stop them? And this comes up as one of the ways that we can cause problems for our competitor. Would that change the dynamic here? I think as long as there is a basis for the blocking that we've identified, we being subjectable aspect of Enigma software, that would not change the analysis. And I'd like to say that's not. Even if it's pretextual? Even if it's pretextual. That's not, well, that's not the facts before the Court, but. I understand, but that's what's inherent in Judge Leisnick's question. I think the hypothetical would require a situation where the filtering software provider offered no basis for its filtering decision and didn't tell the consumers what it was doing. If that were the case, and they offered no basis publicly, here Malwarebytes, and this is in the record, Malwarebytes has identified all the different criteria that it considers when it identifies a PUP. If that were not the case and it were just doing blocking without any explanation whatsoever, then that could potentially be an issue. But that's not the case before the Court. The other issue I wanted to get to is that, you know, in Kaspersky, which we concede, the Court there did not address the issue of what otherwise objectionable means. Nonetheless, it did apply the type of adware, commercial adware, to the statute and find that in that case, the adware at issue was properly blocked by Kaspersky. Otherwise objectionable as Enigma proposes it, this terminology is overly narrow. As the Court has recognized, the statute was enacted in 1996. In the legislative history, there's lots of reference to accessing the Internet via modems, which is a far cry from the future, or from the present. And the types of threats and potentially unwanted content that people were being exposed to now on the Internet were not even being imagined at the time. And there's flexibility built into the statute with this terminology of otherwise objectionable. It's reflected in Congress's expressed purpose in the statute of encouraging the development of technological measures to filter content and to give users choice. The ejusdem generis candidate of statutory construction, as Enigma proposes to use it, is not correct in this case. As this Court recognized in Sacramento County, the Kelly case, which refers to the Garcia, this Garcia doctrine from the Supreme Court, where the items that precede an or clause or another more open-ended general term are dissimilar, then the more general term that is construed more generally. And in this case, we have a list of six different dissimilar items. Some of them are similar, like lewd and lascivious are often used or sexually explicit. But there are other things, like harassing or excessively violent. Excessively violent material is not the same as obscene or lewd and lascivious or even harassing. The only real common thread that binds them is that these are the types of materials that someone might find unwanted or might consider to be problematic and would not necessarily want to have them on their computer. And to get to counsel's point that this should be an objective standard, I think the plain language of the statute defies that. The statute uses the term considers, that the provider or the user considers. That is a subjective term. It also, these, all of these terms that are the seven categories in 230C2B, they are in and of themselves subjective notions. The idea of what's harassing or sexually explicit or lewd, these are terms that are really subjective to the eye of the beholder. They are not, if Congress wanted to establish a more rigid framework, then they could have very specifically defined them and then limited them without using the term otherwise objectionable. Are you solely relying on otherwise objectionable and you don't think that this could, your client could base this at all on the word offensive? Well, offensive is not one of the specific, it's not one of the seven items listed. But we think that if you look at otherwise objectionable and harassing, it is a category, expansive category of what harassing is. The type of software that we considered, Malwarebytes considers to be a type of scareware that tells users that they have infections on their computers when in fact they don't. And that's a necessary reason to continue to purchase software. We consider that to be otherwise objectionable and harassing. Okay. The title, the safe harbor, reflects the concept of offensiveness. And I was just, I think we have to look to the title. Yes, yes. And the title is the Good Samaritan Blocking and Screening of Offensive Material. Yes, Your Honor. And then within 230C2B, there's further delineation of what's otherwise objectionable. And we do consider this type of material offensive. So what is your reaction to Mr. Budd's point that, you know, somebody could be doing this for anti-competitive reasons, it's just an excuse? How is the market going to take care of that? The market could take care of that by consumer choice. Again, users do not have to use our software. It's not baked into their ISP or into an internet search engine. And I think this is an important distinction between the immunities of C2A and C2B. C2A applies to the providers of the interactive service, and that's why they have to screen in good faith. Because often, if you are, you know, you're receiving e-mail through your web-based e-mail service or you're using a social network, you may have no idea what's happening in the background when something is being blocked from your view. Are you arguing, to grossly oversimplify, that if you were to block everything, nobody would buy it? Exactly, Your Honor. Or if we were to overly block and consumers would find it difficult to use their computers, consumers aren't going to download our software if that's what happens. But consumers have the choice to use our software and block pups. There are other security software vendors out there. This is record page 39. They've listed scores of them in their complaint. And lots of options available to users. They don't have to use ours. Just in my remaining time to get to the allegation that there's an anti-competitive purpose behind this, I think that the allegations of the complaint really disprove that. One is they've alleged that our programs existed simultaneously, sometimes on the same computers, sometimes users would have our program and their program. If that's the case, and we've then made this decision to flag their content as a pup, that presents users with a decision either to restore theirs or they could decide not to use ours at all. We're not gaining any market share from them. And importantly, they've also alleged that we haven't blocked any of the many other security software companies out there, filtering companies. If our intent was truly to take market share away, we'd be blocking a lot. If Judge Rawlinson would indulge me to ask just one more question relating to the Lanham Act. Yes, Your Honor. Could you comment a little bit on that issue and why the immunity should extend to that? Yes, Your Honor. The Lanham Act is, as Lexmark identified, there are two parts of the Lanham Act. It's not purely an intellectual property statute. There is a trademark component for trademark infringement or false association with a known mark. That's really the IP component of the statute. And IP claims are excluded from immunity of Section 230. What they've alleged is really a federal false advertising and unfair competition claim. That isn't based on misuse or infringement of their marks. It's an allegation that we've defamed their business in some way. And that is not, that component in 1125B is not an intellectual property. IP is not within the IP orbit of the Lanham Act, is that right? Yes, Your Honor.  Thank you, Your Honor. Thank you. Rebuttal. Your Honor, starting with the Lanham Act, Section 230, subsection E, specifically says that nothing about Section 230 is to limit or expand anything pertaining to the intellectual property laws. And the section of the Lanham Act, which we filed claims under, is a remedy for intellectual property law problems and claims. It's not dependent on whether it's a trademark or a copyright issue. And nothing about the distinction by the Supreme Court that has been referred to this morning changes the analysis that 230 was purposely written to not limit what's available under the Lanham Act. Our claims are under the Trademark Act of 1946, clearly an intellectual property law. But what is the actual harm? What is the actual trademark harm? Well, the harm is severalfold. Number one, there's unfair practices in their commercial advertising and, in part, the effect of their disparaging our product. Recall these are a group of people who hold themselves out at Malwarebytes as experts in what is good and bad software and who often are speaking to novice users. So the information from Malwarebytes comes with expertise and strength in the It's not as simple as users can simply not use Malwarebytes and go use Enigma's products because, in point of fact, Malwarebytes is already calling us a threat. We're not a threat. We're an anti-malware product. We're the opposite of a threat, yet they are holding themselves out as experts telling the public that the Enigma products are threats. So it's a trademark disparagement claim? It's not a trademark disparagement claim precisely, Your Honor. That is part of what discovery It's what I'm trying to capture. It's what exactly is the Lanham Act claim? The Lanham Act claim is an 1125A claim under the Trademark Act of 1946, which does not, I acknowledge, turn on a registered mark. If I might, on the good side That's a little elusive to me. I can't pin down exactly what your asserted harm is, what exactly I'm trying to pinpoint exactly what is the trademark harm that you're asserting. The harm is that they are engaged in unfair, false, misleading commercial statements and representations about our product through the way they are telling users on their product that our product is a threat when it is not and telling users that our product is an unwanted program when it's been wanted for 20 years. How does that differ from trademark disparagement? We don't have a registered trademark disparagement claim filed in the case because we're not suggesting that they're suggesting false sponsorship or association. That's the distinction. But the 1125A claim, I noticed my time Oh, go ahead. The 1125A claim is still a trademark act of 1946 remedy, and 230 is not supposed to limit any law pertaining to intellectual property law. But it also can't make anything that fits under 230 you can wedge now into a Lanham Act or an intellectual property claim. I mean, it seems to me you're trying to take what you can't do here and shoehorn it in over here. They're trying to take 230 and use it as a blanket immunity for any and every business tort anywhere in legal precedent of the United States, including anti-competitive, antitrust, unfair trade practices. They say, and they say that they can do it in a 12b-6 with no discovery, no testing, no cross-examination. I see my light is flashing. No, go ahead. As long as we're questioning you, you should answer. If I may make one last point. Sure, go ahead. The bad faith element is an important element here. You cannot logically, you cannot legally block in good faith what you've restricted or designated in bad faith. And subsection B specifically refers to the fact that the protection under subsection B that Malwarebyte tries to hide behind is dependent on, it's tethered on subsection A. And subsection A says you are considering in good faith the material you're designating to block. Good faith is actually an element of both A and B, and at a minimum, it's an implied requirement under the whole statute. Otherwise, the statute is being completely perverted. All right. Thank you, counsel. Thank you for your time. Thank you. Thank you to both counsel for your helpful arguments in this challenging case. The case is submitted for decision by the Court. The next case on calendar for argument is Willis v. Drill Tech.
judges: Schroeder, Rawlinson, Lasnik